J-S35018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: N.W., MOTHER | : | No. 449 EDA 2019 |

Appeal from the Decree January 10, 2019
In the Court of Common Pleas of Philadelphia County
Family Court at No:  CP-51-AP-0000985-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: N.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: N.W., MOTHER | : | No. 450 EDA 2019 |

Appeal from the Decree Entered January 10, 2019
In the Court of Common Pleas of Philadelphia County
Family Court at No:  CP-51-AP-0000986-2018

BEFORE:   OLSON, J., STABILE, J., and STRASSBURGER*, J.

MEMORANDUM BY STABILE, J.:                **FILED SEPTEMBER 19, 2019**

N.W. ("Mother") appeals from the decrees entered January 10, 2019, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated her parental rights to her children, N.C.W., a female born in June

_____

* Retired Senior Judge assigned to the Superior Court.

2013, and N.N.W., a male born in May 2015 (collectively, "the Children").[1] After careful review, we are constrained to reverse.

The facts and procedural history of this case are not entirely clear from the certified record.[2] The record indicates that the Philadelphia Department of Human Services ("DHS") first became involved with the Children due to "[a]llegations of abuse" against Mother. N.T., 1/10/19, at 13. Specifically, it appears that these allegations related to "inappropriate discipline" by Mother. N.T., 10/10/18, at 9. The record indicates that Mother left the Children in the care of a friend and that DHS retrieved the Children from the friend's home. N.T., 1/10/19, at 14. The Children were adjudicated dependent on May 4, 2016, and have remained in foster care since that time. *Id.* at 13.

The Community Umbrella Agency ("CUA") prepared Single Case Plan ("SCP") objectives for Mother, which included attending visitation, as well as

---

[1] The trial court entered separate decrees on the same date involuntarily terminating the parental rights of the Children's putative father, C.A., and the parental rights of any unknown father that the Children may have. Neither C.A., nor any unknown father, filed an appeal.

[2] In its opinion, the trial court relies primarily on the facts alleged in DHS's termination petitions when summarizing the history of this case. We caution the court that mere allegations in a pleading are not evidence, and that it is not permissible to make findings of fact based on allegations alone, absent a stipulation by the parties or admission into the record. *See*, *e.g.*, *General Equipment Mfrs. v. Westfield Ins. Co.*, 635 A.2d 173, 181 (Pa. Super. 1993), *appeal denied*, 644 A.2d 1200 (Pa. 1994) (explaining, in the context of judicial admissions, that "[i]n order to take advantage of the admission contained in the pleadings, the specific paragraphs of the pleadings in which the allegations appear must be offered into evidence.").

obtaining mental health treatment, employment, and housing. *Id.* at 14. Following the Children's adjudication of dependency, Mother made significant progress toward completing her objectives. By the time of a permanency review hearing on January 5, 2017, the juvenile court found Mother to be fully compliant. *Id.* at 16; *See* Exhibits DHS 3 and 4 (permanency review orders entered 1/5/17).[3] Mother was attending mental health therapy and receiving unsupervised visits with the Children in the community. *Id.* at 16-17. The court once again found Mother to be fully compliant following a permanency review hearing on July 21, 2017. N.T., 1/10/19, at 17; *See* Exhibits DHS 3 and 4 (permanency review orders entered 7/21/17). Mother was continuing to attend mental health therapy and had completed a parenting class. N.T., 1/10/19, at 17. She was also continuing to exercise unsupervised visits in the community, although DHS did not believe she had appropriate housing. *Id.*

Mother's progress toward completing her SCP objectives deteriorated briefly later that year. Mother stopped attending mental health therapy. *Id.* at 18. She then reengaged with therapy but attended only sporadically. *Id.* Mother also failed to visit with the Children on a consistent basis. *Id.* at 18-19. After a permanency review hearing on October 8, 2017, the juvenile court reduced Mother's visits from unsupervised in the community to supervised at CUA. *Id.* at 18.

_____

[3] DHS Exhibits 3 and 4 are the Children's dependency dockets, which include the full text of the juvenile court's orders. It is important to note that this Court received only the termination record on appeal and that we do not have access to the dependency record.

Following this setback, Mother remedied her lack of progress. During a permanency review hearing on February 22, 2018, the juvenile court once again found Mother to be fully compliant with her objectives. *Id.* at 19; *See* Exhibits DHS 3 and 4 (permanency review orders entered 2/2/18). Mother was attending her visits with the Children and the court upgraded her visits from supervised back to unsupervised in the community. N.T., 1/10/19, at 19. An additional permanency review hearing took place on April 19, 2018, during which the court found Mother to be fully compliant and directed that the Children could return to her care once she remedied her lack of housing. *Id.*; *See* Exhibits DHS 3 and 4 (permanency review orders entered 2/2/18) ("Child may be reunified with [m]other, pending housing.").

Purportedly, Mother's progress toward completing her SCP objectives deteriorated for a second time. CUA reported that Mother's attendance at her mental health therapy decreased and that she was at risk of being discharged. N.T., 1/10/19, at 20. In addition, CUA reported that Mother's unsupervised visits had become problematic, in that she would take the Children "to places that had not been cleared" and return them "in poor condition." *Id.* Mother was living with a boyfriend. *Id.* However, she would not permit CUA to visit her home. *Id.* Mother also was employed, but she quit her prior job and began working "under the table" at a summer camp. *Id.* At a permanency review hearing on October 10, 2018, the juvenile court reduced her visits from unsupervised in the community to supervised at CUA. *Id.* at 20-21.

On December 19, 2018, DHS filed petitions to terminate involuntarily Mother's parental rights. The trial court held a hearing on January 10, 2019, at which Mother failed to appear. At the conclusion of the hearing, the court announced it would terminate Mother's rights.[4] The court entered decrees memorializing its decision that same day. Mother timely filed notices of appeal on February 11, 2019,[5] along with concise statements of errors complained of on appeal.

Mother raises the following claims for our review:

A. Whether the trial court committed reversible error and abused its discretion when it overruled [M]other's objection, where DHS did not properly serve [M]other with notice of the hearing and goal change petitions[?] Thus [M]other's right to due process was violated by the trial court.

B. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act 23 Pa. C.S.A. §[]2511 (a)(1), (a)(2),

_____

[4] The trial court appointed legal counsel and a guardian *ad litem* to represent the Children during the proceedings. The Children's legal counsel explained at the termination hearing that he met with the Children and that they "seem to really not understand the adoption process, but they're very happy where they are. They want to stay where they are." N.T., 1/10/19, at 33.

[5] Generally, a party must file his or her notice of appeal within thirty days after entry of the order. **See** Pa.R.A.P. 903(a) ("Except as otherwise prescribed by this rule, the notice of appeal . . . shall be filed within 30 days after the entry of the order from which the appeal is taken."). Thirty days after January 10, 2019, was Saturday, February 9, 2019. Thus, Mother timely filed her notices of appeal on Monday, February 11, 2019. **See** 1 Pa.C.S.A. § 1908 ("Whenever the last day of any such period shall fall on Saturday or Sunday, . . . such day shall be omitted from the computation.").

(a)(5), and (a)(8) as [M]other made progress towards working and meeting her [SCP] goals?

C. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental physical and emotional needs of the child as required by the Adoption Act 23 Pa. C.S.A. §[]2511(b)?

Mother's brief at 2 (suggested answer and trial court answers omitted).

We consider these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We focus our attention on Mother's second claim, as it is dispositive of this appeal.[6] While Mother asserts in her statement of questions involved that the trial court terminated her parental rights pursuant to Section 2511(a)(1), (2), (5), and (8), our review of the record confirms that the court applied Section 2511(a)(1) and (2) only. The statute provides as follows, in relevant part:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \*\*\*

23 Pa.C.S.A. § 2511(a)(1), (2).

---

[6] In light of our disposition of Mother's second claim, we need not consider her first and third claims.

To satisfy the requirements of Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008). The trial court must then consider the parent's explanation for his or her abandonment of the child, in addition to any post-abandonment contact. *Id.* This Court has emphasized that a parent does not perform parental duties by displaying a merely passive interest in the development of a child. *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (citations omitted).

In addition, this Court has described the requisite analysis pursuant to Section 2511(a)(2) as follows:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1)

- 8 -

repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its opinion, the trial court explains that it terminated Mother's rights pursuant to Sections 2511(a)(1) and (2) based on the credible testimony of former CUA case manager Makeda Hunter, and current CUA case manager Joe Sargent, who detailed Mother's lack of progress toward completing her SCP objectives during the termination hearing. Trial Court Opinion, 3/22/19, at 19-20. The court provides a recitation of this testimony but engages in no further analysis. *Id.* Instead, the court directs our attention to its explanation at the conclusion of the hearing, during which it stated as follows, in relevant part:

> Regarding Mother, the record is clear, convincing, and uncontradicted that Mother failed to complete any of the objectives laid out for her and was inconsistent throughout the life of the case where she would come into compliance at times and then fall out of compliance completely at other times, presenting a resource that had no potential permanency, presented no security for the children. All the attempts made by the agency and through the two case workers that testified, attempted to

offer mom services, which if accepted and completed, may have brought her into compliance and may have secured the basis for a parental relationship. As a result of mom's lack of consistent compliance, the parental relationship was allowed to dissipate to the point where she is no longer recognized or the testimony supports a finding that there is no parental relationship between [M]other and the two children.

Considering the evidence as a whole, [*sic*] complies with the requirements under the statute 2511 (a)(1) and (2). . . .

*Id.* at 22-23 (quoting N.T., 1/10/19, at 37-38).

Mother responds by arguing, in effect, that the record refutes the trial court's findings. Regarding Section 2511(a)(1), Mother argues that she was making an effort to comply with and complete her SCP objectives during the six months preceding the filing of the termination petition. Mother's brief at 4. She asserts that she visited with the Children, strove to reunify with them, and achieved full compliance. *Id.* at 6. Regarding Section 2511(a)(2), Mother argues that she completed certain SCP objectives, which demonstrates that she could remedy the conditions requiring the Children's placement. *Id.* at 4. She maintains that the only thing preventing her from reunifying with the Children was her lack of housing, which she was attempting to remedy. *Id.* at 7.

After careful review of the certified record in this case, and mindful of our standard of review, which requires us to show great deference to the trial court, we conclude that the record does not support the court's findings by clear and convincing evidence. With respect to Section 2511(a)(1), the record belies the court's finding that Mother refused or failed to perform parental

duties during the six months immediately preceding the filing of the termination petitions on December 19, 2018. As detailed above, Mother was in full compliance with her SCP goals just prior to the relevant six-month period and needed only appropriate housing in order to regain custody of the Children. *See* Exhibits DHS 3 and 4 (permanency review orders entered 4/19/18). The record suggests that Mother remained in full compliance well into the relevant six months. As recently as July 13, 2018, the juvenile court entered orders indicating that Mother's reunification with the Children was imminent. The orders provided that visits between Mother and the Children could "be further modified up to and including reunification by agreement of the parties." *Id.* (status review orders entered 7/13/18).

While there was some testimony at the termination hearing that Mother failed to attend her visits with the Children consistently during the relevant six-month period, this testimony was both unclear and misleading. Ms. Hunter testified that Mother was not visiting the Children "regularly" around the time of the October 10, 2018 permanency review hearing, but did not provide any further detail.[7] N.T., 1/10/19, at 20-21. Moreover, the record contains a copy of the transcript from the October 10, 2018 permanency review hearing, which refutes this characterization. At the hearing, Ms. Hunter testified regarding Mother's participation in visits as follows:

---

[7] Mr. Sargent testified that Mother missed her most recent visit in January. N.T., 1/10/19, at 29.

Q. Okay. And as far as visitation, what is the current status of visitation?

A. Visitation is biweekly at the agency.

Q. And so that's twice per month supervised at your agency?

A. Yes.

Q. And is [M]other consistent with visits?

A. The visits are setup [sic] on my schedule, so so far, we've done two in September and we'll do another two in October.

*** 

Q. Okay. And -- okay. And I have that there was a period of time where mom wasn't visiting for several months. What was your testimony regarding the visits currently? I didn't hear you. I'm sorry.

A. So right now, the visits are biweekly at the agency and they're based on my schedule, so I try and look at what I have available and offer mom and the kids visits when I can get there.

Q. So are you offering them biweekly?

A. Yes.

Q. Oh, okay. And--

A. So I did two in September with her and she was there with them.

*** 

Q. So there's no set schedule with –

A. No.

Q. **Okay. In August, did mom have any visits?**

A. **No.**

Q. **Was that based upon your schedule?**

A. **Yes.**

Q. **Okay.   Were those visits made up (unintelligible) scheduling permit her to visit?**

A. **No, I didn't make them up yet.**

Q. Okay so the plan is to make those visits up?

A. Sure.  I can offer an extra hour on her visits for October.

N.T., 10/10/18, at 7-10 (emphasis added).

Accordingly, while the record contains testimony indicating that Mother was visiting the Children inconsistently, it is not clear how inconsistent her visits were.  More troublingly, it appears that at least part of the reason Mother was visiting with the Children inconsistently was not that she was failing to attend scheduled visits, but that CUA was failing to schedule the visits to which Mother was entitled, even going as long as a month at a time without allowing her to see the Children.  This was not sufficient evidence, nonetheless clear and convincing, from which the trial court could conclude that Mother had refused or failed to perform her parental duties during the relevant six-month period.

The record also fails to support the trial court's findings by clear and convincing evidence with regard to Section 2511(a)(2).  DHS focused much of its evidence during the termination hearing on its assertion that Mother failed to comply with her SCP objectives.  However, noncompliance with SCP objectives is not by itself a statutory basis for the termination of parental

rights. With regard to Section 2511(a)(2), a parent's noncompliance with SCP objectives is relevant only to the extent that it reveals he or she has exhibited a "repeated and continued incapacity, abuse, neglect or refusal" that "has caused the child to be without essential parental care, control or subsistence" and that the parent "cannot or will not" remedy. 23 Pa.C.S.A. § 2511(a)(2).

In the instant case, the record reveals no clear and convincing evidence sufficient to support a finding that Mother's purported failure to comply with her SCP objectives renders her incapable of providing parental care, or that she cannot or will not remedy that incapacity. In addition to attending visitation, as listed above, Mother's objectives included obtaining mental health therapy, employment, and housing. N.T., 1/10/19, at 14.

Regarding mental health, Ms. Hunter testified that Mother's attendance at therapy decreased significantly sometime after April 2018. N.T., 1/10/19, at 19-20. Mother's mental health provider discharged her at an unspecified time and Mother reengaged in treatment in September 2018. N.T., 10/10/18, at 7-9. Mr. Sargent testified that Mother last attended mental health therapy in November 2018 and that she was only attending therapy sporadically prior to that. N.T., 1/10/19, at 28. Thus, the evidence supports the trial court's finding that Mother was not compliant with her mental health SCP objective at the time of the termination hearing.

However, after exhaustive review, the record contains no evidence that Mother was in need of mental health treatment. As discussed above, DHS

initially became involved with Mother due to her allegedly poor parenting skills and neglect. Specifically, DHS received allegations that Mother disciplined the Children improperly and that she abandoned the Children at a friend's home and did not return. The record does not indicate that Mother suffers from any diagnosed mental health condition, and it is not even clear why the juvenile court ordered her to attend mental health therapy in the first place. While it is possible that the court believed Mother's behavior at the start of this case suggested that she was suffering from an underlying mental health problem, there is no indication of that in the record either. Moreover, Mother had been attending therapy, albeit inconsistently, for nearly two years by the time of the termination hearing and it is not apparent why ongoing treatment would be necessary. Absent some evidence in the record that Mother's inconsistent attendance at therapy renders her incapable of providing parental care, her noncompliance with a mental health objective does not support termination of her parental rights pursuant to Section 2511(a)(2).

Mother's failure to comply with her employment and housing objectives is equally unavailing. Ms. Hunter testified during the termination hearing that Mother has held a variety of jobs throughout the Children's dependency. She explained:

> For the most part, [Mother] was employed at a department store . . . and then she quit there and went to work at a summer camp, where she was off the books, then she told me about a job at McDonald's that lasted for about a week and the last contact I had with her, she was supposed to be starting a job but didn't tell me where.

N.T., 1/10/19, at 27. Ms. Hunter left her employment at CUA on November 22, 2018. *Id.* at 21. While Mr. Sargent testified that he took over this case on December 10, 2018, he did not specify whether Mother ultimately obtained new employment, nor did anyone ask him to clarify her employment status. *Id.* at 28. As for Mother's housing, Ms. Hunter testified that Mother moved in with her boyfriend, but that she did not permit CUA to visit the home. *Id.* at 20. Mother also acknowledged that the home "was not appropriate for the [C]hildren." N.T., 10/10/18, at 7.

Accordingly, the record indicates that Mother has maintained some form of employment throughout most if not all of this case. While it appears that Mother's recent employment has been inconsistent, DHS did not produce clear and convincing evidence that Mother's circuitous career path has been improper or inadequate to provide for herself or for the Children. Conversely, while Mother's lack of appropriate housing certainly does suggest that she is incapable of providing parental care, the record does not reveal why Mother has remained without housing. Significantly, the Adoption Act defines both Mother's income and her housing as "environmental factors." 23 Pa.C.S.A. § 2511(b). Section 2511(b) provides that a trial court may not terminate a parent's rights involuntarily "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." *Id.* In the instant matter, the record does not contain evidence that Mother was at fault for her lack of housing,

other than a single unexplained statement by Ms. Hunter that Mother failed to follow through with "the efforts that we made to help [her] secure housing[.]" N.T., 1/10/19, at 23. Absent further development of this issue, and given the dearth of other evidence buttressing the trial court's conclusions, the record does not support involuntary termination pursuant to Section 2511(a)(2) by clear and convincing evidence.

Based on the foregoing, we conclude that the record does not support the trial court's decision to terminate Mother's parental rights to the Children and that it was an abuse of the court's discretion to conclude otherwise. We therefore reverse the court's January 10, 2019 decrees. DHS may file new petitions to terminate Mother's parental rights, but we stress that the court may not grant those petitions unless DHS presents evidence and develops a clear record establishing grounds for termination pursuant to Section 2511.

Decrees reversed. Jurisdiction relinquished.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/19/19